JAMES E. SMITH (DC Bar No. 482985)
Email: smithja@sec.gov
CHRISTIAN SCHULTZ (DC Bar No. 485557)
Email: schultzc@sec.gov
KEVIN GUERRERO (AZ Bar No. 023673)
Email: guerrerok@sec.gov
LAURA J. CUNNINGHAM (DC Bar No. 1029465)
Email: cunninghaml@sec.gov
WARREN E. GRETH, JR. (VA Bar No. 72988)
Email: grethw@sec.gov
CORI M. SHEPHERD (DC Bar No. 993503)
Email: shepherdco@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-8430
Facsimile: (202) 772-9282
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>   vs.<br><br>RMR ASSET MANAGEMENT COMPANY, et al,<br><br>       Defendants. | Case No. 3:18-cv-01895-AJB-LL<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST RICHARD GOUNAUD, MICHAEL SEAN MURPHY, AND JOCELYN MURPHY**<br><br>Date: June 25, 2020<br>Time: 2:00 p.m.<br>Ctrm: 4A<br>Judge: Hon. Anthony J. Battaglia |

1

# **TABLE OF CONTENTS**

2

3   I.      INTRODUCTION ...................................................................................1

4   II.     STATEMENT OF FACTS ....................................................................2

5           A.     New Issue Municipal Bonds. ...............................................2

6           B.     Defendants Traded Securities for RMR's Account as Independent
7                  Contractors of RMR. ...........................................................5

8           C.     Jocelyn Murphy Provided False Zip Codes to Obtain New Issue
                   Municipal Bonds on a Retail Priority Basis. ......................10

9   III.    ARGUMENT ......................................................................................11

10          A.     Standard of Review. ...........................................................11

11          B.     Defendants Acted as Unregistered Broker-Dealers in Violation of
12                 Section 15(a) of the Exchange Act. ....................................12

13                 1.     Legal Standard. ........................................................12

14                 2.     Defendants Acted As Unregistered Brokers Because They
15                        Effected Securities Transactions for RMR in Return for
                          Transaction-Based Compensation. ...........................15

16          C.     Jocelyn Murphy Fraudulently Obtained New Issue Bonds in
                   Violation of Section 10(b) and Rule 10b-5. .......................18

17

18                 1.     Legal Standard. ........................................................18

19                 2.     Jocelyn Murphy Made Material Misrepresentations. ..............19

20                 3.     Jocelyn Murphy Acted with Scienter. ......................20

    IV.     CONCLUSION ..................................................................................21

21

22

23

24

25

26

27

28

i

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..................................................................................12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................12

*Celsion Corp. v. Stearns Mgtm. Corp.*,
    157 F. Supp. 2d 942 (N.D. Ill. 2001)......................................................12

*Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*,
    No. 8:04cv586, 2006 WL 2620985 (D. Neb. Sept. 12, 2006)..................14, 17

Ernst & Ernst v. Hochfelder,
    425 U.S. 185 (1976)..................................................................................20

*Gebhart v. SEC*,
    595 F.3d 1034 (9th Cir. 2010) .................................................................20

*In the Matter of Frederick W. Wall*,
    Exchange Act Rel. No. 52467, 2005 SEC LEXIS 2380 (Sept. 19, 2005) ........13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)..................................................................................12

*SEC v. Alliance Leasing Corp.*,
    28 Fed. Appx. 648 (9th Cir. 2002) ..........................................................19

*SEC v. Bravata*,
    No. 09–12950, 2009 WL 2245649 (E.D. Mich. July 27, 2009).................14, 15

*SEC v. Charles A Morris & Assoc.*,
    *Inc.*, 386 F. Supp. 1327 (W.D. Tenn. 1973).............................................19

*SEC v. Collyard*,
    174 F. Supp. 3d 781 (D. Minn. 2015) .....................................................14, 17

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) ...................................................................18

ii

*SEC v. Feng*,
        935 F.3d 721 (9th Cir. 2019) ....................................................................13, 21

*SEC v. George*,
        426 F.3d 726 (6th Cir. 2005) ...............................................................14

*SEC v. Hansen*,
        No. 83 Civ. 3692 (LPG), 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984) ................13

*SEC v. Holcom*,
        No. 12 cv 1623, 2015 WL 11233426 (S.D. Cal. Jan. 8, 2015) ........................15

*SEC v. Interlink Data Network*,
        No. 93 3073 R, 1993 WL 603274 (C.D. Cal. Nov. 15, 1993).   .......................12

*SEC v. Kramer*,
        778 F. Supp. 2d 1320 (M.D. Fla. 2011) ................................................14

*SEC v. Murphy*,
        626 F.2d 633 (9th Cir. 1980) ...............................................................19

*SEC v. Phan*,
        500 F.3d 895 (9th Cir. 2007) ...............................................................18

*SEC v. Rana Research, Inc.*,
        8 F.3d 1358 (9th Cir. 1993) .................................................................18

*SEC v. Schooler*,
        106 F. Supp. 3d 1157 (S.D. Cal. 2015) .................................................11

*SEC v. Scott, Gorman Municipals, Inc.*,
        407 F. Supp. 1383 (S.D.N.Y. 1975) ....................................................19

*SEC v. Small Bus. Capital Corp.*,
        No. 5:12-CV-3237 EJD, 2013 WL 4455850 (N.D. Cal. Aug. 16, 2013).........13

**Statutes**

15 U.S.C. § 77(a)(1)...........................................................................12

15 U.S.C. §78c(a)(10).........................................................................12

Section 15(a)(1)
        [15 U.S.C. § 78o(a)(1)]...............................................................1

Section 10(b)
     [15 U.S.C. § 78j(b)] ........................................................................2, 18

Section 15(a)
     [15 U.S.C. § 78o(a)] ........................................................................1, 12

Section 3(a)(4)(A)
     [15 U.S.C. § 78c(a)(4)(A)] ...............................................................13

Section 3(a)(9)
     [15 U.S.C. § 78c(a)(9)] .....................................................................13

**Rules**

Rule 10b-5
     [17 C.F.R. § 240.10b-5].......................................................................2

Fed. R. Civ. P. 56(a)......................................................................................11

iv

1

## I.    **INTRODUCTION**

2

3       This case concerns the illegal trading of new issue municipal bonds and other

4  securities by Richard Gounaud ("Gounaud"), Michael Sean Murphy ("Michael

5

6  Murphy"), and Jocelyn Murphy ("Jocelyn Murphy") (collectively, "Defendants").

7  Defendants engaged in their misconduct on behalf of Ralph Riccardi ("Riccardi") and

8  his company RMR Asset Management Company ("RMR"), former defendants in this

9  matter who settled the claims brought against them by the Securities and Exchange

10  Commission ("SEC").[1]  For the reasons set forth below, the SEC seeks summary

11

12  judgment as to liability against each Defendant.

13       The undisputed evidence establishes that each of the Defendants acted as an

14  unregistered broker in violation of Section 15(a)(1) of the Securities Exchange Act of

15

16  1934 (the "Exchange Act"), 15 U.S.C. § 78o(a)(1).  Over a period of years, each

17  Defendant participated in thousands of securities transactions on behalf of RMR

18  using RMR's money, in return for hundreds of thousands of dollars in commissions

19

20  from RMR.  Defendants' securities transactions for Riccardi and RMR constitute

21  broker activity, and Defendants engaged in this conduct without ever registering with

22  the SEC as brokers.  Accordingly, because Section 15(a) violations are subject to

23

24  strict liability – no proof of scienter is required – Defendants are liable for acting as

25  unregistered brokers in violation of Section 15(a)(1) of the Exchange Act.

26

27  ───────────────
[1] Riccardi, RMR, and RMR's nine other independent contractors already settled
28  unregistered broker and fraud claims brought by the SEC.  Dkt. Nos. 3-22.

1

The undisputed evidence also establishes that Jocelyn Murphy committed fraud when she bought new issue municipal bonds on behalf of RMR.  Ms. Murphy lived and worked in Colorado when she submitted orders to purchase bonds from issuers located in other parts of the country, such as Oregon and California.  Ms. Murphy repeatedly and knowingly provided false zip codes from those jurisdictions with her purchase orders for these high-demand bonds so that her orders would receive the highest priority, and therefore, have a much greater chance of being filled. Accordingly, Jocelyn Murphy is liable for violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## II.   STATEMENT OF FACTS

### A.   New Issue Municipal Bonds.

State and local governments often raise money by issuing bonds that are sold to the public to "provide capital, or loans, to municipal entities so that projects such as highways, water and sewer plants, office buildings, power plants, hospitals, housing projects, etc. can be financed and maintained."  Expert Report of Nathaniel Singer ("Singer Report") at 7 (Smith Decl. Ex. A).  These bonds act as loans from the bond purchasers, and the governmental entity issuing the bonds repays the principal and interest back to investors.  *Id.*  Investors often receive an additional benefit, as the interest paid on the municipal bond is generally exempt from federal and state taxes.  *Id*.

As part of this process, one broker-dealer or a syndicate of broker-dealers – also known as underwriters – purchases new bonds from the state or local

government issuing the bonds ("the issuer") and sells these new issue bonds to investors.  *Id.*  Municipalities routinely make their new issue bonds available to the public during designated "order periods," which are windows of time when underwriters solicit orders from their customers.  *Id*. at 9.  Underwriters announce new issue bond offerings by electronically distributing "pricing wires" to a broad group of potential investors.  *Id.*  Underwriters use the pricing wires to detail the bonds being offered for sale as well as rules that apply to the offering.  *Id.* 8-10, 14.

A "key component" of pricing wires is the "priority of orders" policy, which establishes how an issuer will allocate bonds among various classes of investors – a "pecking order" – if there are more purchase orders than there are bonds being sold by the issuer (*i.e.*, the bond offering is oversubscribed).  Singer Report at 10; Dep. Ex. 81 (example of pricing wire from Oregon with priority of orders) (Smith Decl. Ex. B).   Issuers often specify separate order periods for different categories of customers, with an initial order period reserved exclusively for retail customers, known as a "retail order period."  Singer Report at 13.  When an issuer includes a retail order period in the priority of orders, retail investors from within the issuer's jurisdiction are generally afforded the highest priority and are first to receive new issue bonds.  *Id*. at 13-14.  The priority afforded to retail customers within the issuer's jurisdiction means that, when an offering is oversubscribed, retail customers in that jurisdiction have the best chance of getting their orders filled and are not "crowded out" by retail customers from other jurisdictions or non-retail customers.  *Id*.

3

The pricing wires often contain definitions that establish eligibility to participate in a retail order period, and a common requirement is that the highest priority "retail" order can be placed only by a retail investor who resides in the issuer's state or locality. *Id*. at 14-16. This retail order priority demonstrates an issuer's desire to favor in-state retail investors over non-local and non-retail investors. *Id*. at 13-14. The use of zip codes provides the issuer a means of "policing" the retail order period to ensure that only those investors who live within the issuer's jurisdiction obtain bonds first.[2] This measure provides issuers and underwriters with the ability to allocate bonds to retail investors looking to support their communities with a long-term investment, rather than investors who want to sell the bonds as soon as possible to make a quick profit. Singer Report at 14. In such instances, the pricing wires require retail investors to provide their zip codes as a way to verify that the retail investor is a resident of the issuer's jurisdiction. *Id*.

---

[2] Singer Report at 13-14; Decl. of Blake Fowler, the Director of the Public Finance Division at the California State Treasurer's Office at ¶ 8 (stating that zip codes are a means of protecting the integrity of the bond offering) (Smith Decl. Ex. C); Decl. of Laura Lockwood McCall, the Director of the Debt Management Division for the Oregon State Treasury at ¶ 10 (same) (Smith Decl. Ex. D).

**B.     Defendants Traded Securities for RMR's Account as Independent Contractors of RMR.**

Ralph Riccardi founded RMR in 1995, and its primary business was to buy and quickly re-sell municipal bonds and other securities.  Nov. 13, 2019 Deposition of Ralph Riccardi ("Riccardi Tr.") at 27:24-28:9 (Smith Decl. Ex. E).  Beginning as early as 2006, Riccardi engaged Defendants as independent contractors of RMR to purchase securities on RMR's behalf.  Riccardi Tr. at 29:21-31:9; 34:16-20; 167:6-8.[3]  In particular, Riccardi enlisted Defendants to open new brokerage accounts to help RMR increase the number of orders it could place for new issue municipal bonds and other high-demand securities, and thereby increase RMR's access to these securities.  Riccardi Tr. at 31:6-33:10; 153:1-154:8.

Riccardi directed Defendants to trade for RMR through delivery versus payment ("DVP") brokerage accounts at various broker-dealers.  Riccardi Tr. at 47:14-23; 152:22-154:8; 157:14-161:13.  Unlike traditional retail brokerage accounts, DVP brokerage accounts did not require Defendants to maintain cash in the account to purchase securities.  Riccardi Tr. at 47:5-49:16; J. Murphy Tr. at 41:22-42:12.  Instead, Defendants used their DVP accounts to submit orders for securities sought by RMR so

---

[3] Defendant Gounaud started trading securities for RMR in 2006, and Defendants Jocelyn Murphy and Michael Sean Murphy started trading for RMR in approximately 2010.  Riccardi Tr. at 92:6-13; Nov. 20, 2019 Deposition of Jocelyn Murphy ("J. Murphy Tr.") at 12:11-12 (Smith Decl. Ex. F); Nov. 18, 2019 Deposition of Richard Gounaud ("Gounaud Tr.") at 14:21-23 (Smith Decl. Ex. H).

that RMR did not have to pay for them until the settlement date, which was typically 5-14 days after the securities were delivered.  Riccardi Tr. at 33:22-24; 46:1-49:16. Riccardi and Defendants linked the Defendants' DVP accounts to particular sub-accounts of a prime broker account that RMR owned and controlled.[4]  Riccardi Tr. at 152:22-153:24; J. Murphy Tr. at 17:11-18:15; Nov. 19, 2019 Deposition of Michael Murphy ("M. Murphy Tr.") at 50:1-17 (Smith Decl. Ex. G); Gounaud Tr. at 64:17-23. By linking their DVP accounts to RMR's prime brokerage account, Defendants were able to buy and sell securities on behalf of RMR without using any of their own funds. Riccardi Tr. at 31:6-33:10; 157:14-160:3.

With respect to new issue municipal bonds, in the ordinary course, Riccardi or an RMR employee would email Defendants the pricing wire or instructions for an upcoming municipal bond offering and direct them to seek an allotment of particular bonds in particular quantities.[5]  *See, e.g.*, Smith Decl. Exs. B, I, J.  After receiving their instructions, Defendants submitted orders for Riccardi's desired bonds using their DVP

---

[4] A prime broker account provides a bundled group of services to large investment clients that need to be able to borrow securities or cash in order to engage in netting, the process of offsetting the value of multiple securities positions or payments that are due to be exchanged between two or more parties to achieve absolute returns. *See, e.g.*, https://www.investopedia.com/terms/p/primebrokerage.asp *and* https://www.investopedia.com/terms/n/netting.asp.

[5] For other types of securities, such as stock, Defendants generally had discretion to purchase these securities on behalf of RMR as long as their purchases remained within the parameters set by Riccardi for the use of RMR's capital.  Riccardi Tr. 34:3-20, 35:6-36:10, 148:20-149:12, 162:16-164:11.

accounts and later emailed Riccardi or an RMR employee indicating whether they received an allotment of the desired bonds.  *See, e.g.*, Smith Decl. Exs. K, L, M.

If Defendants were able to obtain securities for RMR, RMR would then sell those securities to counterparties through RMR's prime brokerage account – typically, in the case of new issue municipal bonds, brokers that Riccardi or one of the Defendants had lined up prior to the Defendant's submission of the purchase order.[6]  Riccardi Tr. at 33:4-10; 57:20-59:18; 61:2-25; 90:6-19.[7] On settlement date for the securities, RMR always paid the purchase price of the securities with its own capital from its prime brokerage account, and all the securities bought or sold by Defendants on behalf of RMR were cleared through RMR's prime brokerage account.   Riccardi Tr. at 31:4-33:10; 47:14-23; 49:10-16; 163:17-164:6.  RMR's clearing agent would affirm the

---

[6] Jocelyn Murphy sometimes identified counterparties interested in purchasing new issue municipal bonds prior to submitting orders for new issue municipal bonds. Riccardi Tr. at 60:15-22; 91:16-21.  In these instances, the purchase and sale cleared through RMR's prime brokerage account using RMR's capital, just as with all of Ms. Murphy's bond transactions.

[7] When selling new issue municipal bonds obtained by Defendants, Riccardi and RMR generally lined up buyers for the bonds before directing Defendants to place purchase orders for the bonds.  Riccardi Tr. at 57:20-59:18; 61:2-25; 90:6-19. Riccardi and RMR – and sometimes Jocelyn Murphy – distributed the pricing wires to broker-dealers to solicit their interest in purchasing the offered bonds.  *Id.* at 60:15-22; 91:16-21; Smith Decl. Ex. N.  If a Defendant obtained new issue municipal bonds, the Defendant or Riccardi would then quickly re-sell the bonds to the broker-dealer based on the pre-arranged agreement.  *Id.* at 33:1-10; 48:4- 49:16; 61:2-25; 90:6-16; 91:16-21. When selling stock obtained by Defendants, Riccardi did not line up buyers for the stock because RMR generally sold the stock by RMR's introducing broker on an exchange.  Riccardi Tr. at 62:5-64:5.

trade, and the payments for both the buy and sell sides of the transactions would take place in RMR's prime broker account with RMR's capital.  *Id.* at 32:13-33:5-10.

Once the purchase and sale transactions were complete, RMR paid each Defendant a commission on the sales of the securities they obtained for RMR, typically amounting to roughly 50% of the profits RMR realized on the sale after deducting transaction costs.  *Id.* at 76:19-78:17; M. Murphy Tr. 67:24-68:6, 127:17-19, 140:10-14; J. Murphy Tr. 114:5-115:1; Gounaud Tr. 56:17-57:2.[8]  At no point did Defendants control the capital that funded the purchase of the securities, nor did they control the profit or loss realized on the re-sale of the securities obtained through their DVP accounts.  *Id.* at 163:17-164:6; J. Murphy Tr. 151:1-152:4; M. Murphy Tr. 56:24-57:3, 67:14-23, 96:15-17; Gounaud Tr. 71:25-72:21, 118:20-24.

RMR employees recorded all trading carried out by Defendants in their DVP accounts on a "blotter."  Riccardi Tr. at 40:15-45:19; Smith Decl. Exs. O, P, Q.  RMR's "blotter" was a record of all Defendants' trading for RMR's account for a given time period.  Nov. 14, 2019 Deposition of RMR employee Raquel Otis ("Otis Tr.") at 20:3-18 (Smith Decl. Ex. R).  On a periodic basis, RMR would email "commission reports" to each of the Defendants that was generated from RMR's company-wide blotter.

---

[8] Alternatively, if Riccardi directed one of the Defendants to purchase new issue municipal bonds and directed another Defendant (or other RMR independent contractor) to sell those bonds, each Defendant would receive 33% of the profits from the sale of the bonds from RMR.  Riccardi Tr. at 109:20-111:11; J. Murphy Tr. at 189:23-190:5; M. Murphy Tr. at 141:9-25.

Riccardi Tr. at 108:12-114:14; 128:18-131:11; 142:19-144:22; 146:-148:6.  These commission reports detailed the monthly trading conducted by each Defendant and the commissions RMR paid to each Defendant for their trading activity on behalf of RMR. Riccardi Tr. at 131:6-11; 131:3-22; 147:4-21; *see, e.g.,* Smith Decl. Exs. S, T, U, V, W.

The RMR blotters show that Defendants engaged in thousands of securities transactions for RMR, including transactions in new issue municipal bonds, stocks, and other securities:[9]

- Jocelyn Murphy engaged in **6,407** securities transactions for RMR, including **2,410** transactions involving new issue municipal bonds, between November 28, 2011 and June 29, 2017;

- Michael Murphy engaged in **10,179** securities transactions for RMR, including **399** transactions involving new issue bonds, between November 28, 2011 and March 10, 2017; and

- Richard Gounaud engaged in **2,250** securities transactions for RMR, including **360** transactions involving new issue municipal bonds, between August 14, 2013 and May 4, 2017.

Apr. 23, 2020 Decl. of Laura J. Cunningham ("Cunningham Decl.") ¶¶ 9, 13, 17.

---

[9] In addition to seeking allotments of new issue municipal bonds, Defendants also traded in stock and other securities using RMR's prime brokerage account and RMR's capital.  Riccardi Tr. at 98:10-101:23; M. Murphy Tr. at 70:2-6.  As with Defendants' municipal bond transactions, their trading in other securities for RMR also violates Section 15(a) of the Exchange Act.  Should the Court grant the SEC's request for summary judgment on its Section 15(a) claim based on Defendants' trading of municipal bonds on behalf of RMR, the SEC reserves the right to present evidence concerning Defendants' transactions in stock and other securities, for purposes of determining disgorgement and penalties during any remedies proceeding.

**C.      Jocelyn Murphy Provided False Zip Codes to Obtain New Issue Municipal Bonds on a Retail Priority Basis.**

Jocelyn Murphy routinely submitted orders for new issue municipal bonds during retail order periods.  J. Murphy Tr. at 93:23-95:18; 102:22-103:22; 125:18-127:16; 129:10-132:4; 156:10-159:22; *see, e.g.,* Smith Decl. Exs. X, Y, Z.  As described above, pricing wires announcing the offering of new issue municipal bonds often contained rules stating that the first priority for the purchase of the bonds was for retail customers in the issuer's jurisdiction.  *See, e.g.,* Smith Decl. ex. B at p. 2 (first priority to "Oregon Individual Retail"), Smith Decl. Ex. AA at p. 3 (first priority to "California Retail"); *see also* Singer Report at 14-16.  Pursuant to the retail order period rules for particular offerings, Ms. Murphy typically provided the brokers where she held DVP accounts with a zip code to submit to the underwriters with her order.  *See, e.g.*, Smith Decl. Exs. X, Y, BB, CC.  Ms. Murphy understood that retail orders, as listed in the priority of orders, were reserved for individual investors with zip codes in the issuer's jurisdiction. J. Murphy Tr. at 91:14-21; 155:5:156:5.  Ms. Murphy also knew if she submitted her Colorado zip code with an order for bonds issued outside of Colorado where the issuer had reserved the highest priority for in-state residents, her order would not qualify for the highest retail priority.  *See, e.g.*, J. Murphy Tr. at 156:3-5 (explaining that using her Colorado zip code would not qualify for California retail bonds).

Ms. Murphy, however, did not provide the zip code of her Colorado residence with her orders for new municipal bonds issued outside of Colorado.  Instead, when

placing orders for bonds from issuers located outside of Colorado, such as issuers in Oregon and California, Ms. Murphy provided zip codes corresponding to those jurisdictions. *Id.* at 96:17-98:19; 100:17-103:22; 109:4-11; 123:22-129:5; 129:10-131:18; 132:17-136:17; 153:20-160:3; Smith Decl. Exs. X, Z, CC, DD.  Ms. Murphy also submitted more than one false zip code to different brokers when placing several orders for the same bonds.  *See, e.g.*, Smith Decl. Exs. X, Z, CC (submitting two different California zip codes), DD (submitting two different Oregon zip codes).  In doing so, Ms. Murphy essentially presented herself as several different retail investors to the issuer and underwriter, in an effort to obtain even more new issue bonds during the retail order period from the issuer.  Ms. Murphy obtained allotments of new issue bonds on a retail priority basis based on the false zip codes she submitted from issuers in Oregon and California, among others, despite the fact that she did not live in those jurisdictions.  *See, e.g.*, Smith Decl. ex. EE, FF.

## III.   ARGUMENT

### A.   Standard of Review.

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and … the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A plaintiff moving for summary judgment meets its burden by establishing for each element of the claim that no reasonable trier of fact could find for the opposing party.  *See Celotex*, 477 U.S. at 323; *SEC v. Schooler*, 106 F. Supp. 3d 1157, 1161 & n.1 (S.D. Cal. 2015).  Once the moving

party has met its burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. Defendants Acted as Unregistered Broker-Dealers in Violation of Section 15(a) of the Exchange Act.

#### 1. Legal Standard.

Section 15(a) of the Exchange Act makes it unlawful for a broker or dealer "to make use of the mails or any means or instrumentality of interstate commerce[10] to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless the broker or dealer is registered with the SEC in accordance with Section 15(b).[11] Section 15(a) is strict liability statute; neither scienter nor negligence is required to prove its violation. *Celsion Corp. v. Stearns Mgtm. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001); *SEC v. Interlink Data Network*, No. 93 3073 R, 1993 WL 603274, *10 (C.D. Cal. Nov. 15, 1993).

---

[10] There is no dispute that Defendants used the means and instrumentalities of interstate commerce while engaging in the securities transactions described herein. Answer of Jocelyn and Michael Murphy, ¶ 11 (Dkt No 39); Gounaud Tr. at 171:24-173:25.

[11] There is no dispute that new issue municipal bonds and equities or stock are "securities" under federal securities laws. *See* 15 U.S.C. § 77(a)(1) and § 78(c)(a)(10) (definition of "security" under the Securities Act and the Exchange Act).

Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A); *see also* 15 U.S.C. § 78c(a)(9) (defining "person" to include a company).  The definition of broker "should be construed broadly and … exemptions from registration requirements that flow from [Section 3(a)(4)] should be 'narrowly drawn in order to promote both investor protection and the integrity of the brokerage community.'"  *In the Matter of Frederick W. Wall*, Exchange Act Release No. 52467, 2005 SEC LEXIS 2380, *8 n.9 (Sept. 19. 2005) (Comm. Op.) (*quoting* Exchange Act Release, No. 22172, 33 SEC Docket 685, 686 (June 27, 1985)).

The Ninth Circuit applies conduct-based factors and a "totality of the circumstances approach" to determine whether a person has engaged in the business of being a broker.  *See SEC v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019).   Known as *Hansen* factors, these factors consider whether the person, for example, received transaction-based income, such as commissions as opposed to a salary, and regularly participated in securities transactions.[12]  *Id*. at 732 (*citing SEC v. Hansen*, No. 83 Civ. 3692 (LPG), 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)); *SEC v. Small Bus.*

---

[12] Courts may consider other *Hansen* factors: whether the person is an employee of the issuer, sold the securities of other issuers, was involved in the negotiations between the issuer and the investor, advertised for clients, gave advice regarding investments, and/or was an active finder of investors.  *See Feng*, 935 F.3d at 732. Defendants' conduct satisfies several of these additional *Hansen* factors, as none of the Defendants were employed by any issuer, they all sold securities of issuers, and Jocelyn Murphy actively located investors to purchase securities sold by RMR.  *See, e.g.*, Smith Decl. Exs. N and FF.

*Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at \*14 (N.D. Cal. Aug. 16, 2013) (adopting *Hansen* factors).  No one factor is dispositive and a Court can find a person acted as a broker even where only one or two of the *Hansen* factors are met. *See, e.g., SEC v. Collyard*, 154 F. Supp. 3d 781, 789 (D. Minn. 2015) (*reversed on other grounds* 935 F.3d 721 (8th Cir. 2019)); *see also SEC v. George*, 426 F.3d 726, 797 (6th Cir. 2005).

Courts emphasize two of the *Hansen* factors as most important when analyzing whether a defendant was "in the business of effecting securities transactions": regularity of participation in securities transactions and receipt of transaction-based compensation.  *See, e.g.*, *SEC v. Bravata*, No. 09–12950. 2009 WL 2245649 at \*2 (E.D. Mich. July 27, 2009) ("regularity of participation [in securities transactions] is the primary indicia of being 'engaged in the business.'") (internal quotations omitted); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) ("transaction-based compensation is the hallmark of a salesman"); *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04cv586, 2006 WL 2620985, at \*6 (D. Neb. Sept. 12, 2006) ("Transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer,"); *see also Collyard*, 154 F. Supp. 3d at 789.  In the present case, there is ample, undisputed evidence that Defendants' conduct meets both factors.

### 2. Defendants Acted As Unregistered Brokers Because They Effected Securities Transactions for RMR in Return for Transaction-Based Compensation.

Defendants acted as unregistered brokers[13] in violation of Section 15(a)(1) of the Exchange Act when they engaged in the business of effecting securities transactions by regularly transacting for the account of another, RMR, while earning transaction-based compensation from RMR.

*First*, Defendants' frequent transactions for the account of RMR demonstrate regularity of participation, which courts in this District and elsewhere have held is "[t]he most important [*Hansen*] factor." *SEC v. Holcom*, No. 12 cv 1623, 2015 WL 11233426 at *4 (S.D. Cal. Jan. 8, 2015) (quoting *Bravata*, 2009 WL 2245649 at *2). Riccardi and RMR directed Defendants to link their DVP brokerage accounts to RMR's prime broker account so Defendants could use RMR's capital from RMR's prime broker account to purchase new issue municipal bonds and other securities. Riccardi Tr. at 32:8-33:10; 160:10-11; J. Murphy Tr. at 17:11-18:15; 41:19-42:12; 112:8-113:11; M. Murphy Tr. at 50:1-17; 65:21-66:1; Gounaud Tr. at 64:17-23; 82:2-12; 100:25-101:19.   While Defendants controlled their DVP brokerage accounts, they conducted all of their trading activity on behalf of RMR through RMR's prime

---

[13] Defendants admit they did not register with the SEC or any other financial regulatory agency while trading for RMR.  *See* M. Murphy Tr. at 157:6-12; J. Murphy Tr. 173:10-18; Gounaud Tr. at 170:16-171:12; *see also* Declaration of Vanessa Countryman, Secretary of the SEC (certifying SEC has no registration records for Defendants).  Smith Decl. Ex.GG.

brokerage account.  *See id*.  Riccardi and RMR funded all of Defendants trades using RMR's capital in its prime broker account, which RMR solely owned.   Riccardi Tr. at 164:2-6.  Defendants concede that they did not have access to the sub-accounts in RMR's prime broker account or the securities or capital within it.  J. Murphy Tr. at 44:11-20; 172:16-173:9; M. Murphy Tr. at 57:2-3; 67:14-23, 144:24-145:10; Gounaud Tr. at 82:8-12.

All of Defendants' trading for RMR was tracked in RMR's blotters, which RMR kept as business records, and Defendants have not disputed that they conducted securities transactions for RMR.  *See, e.g.*, Smith Decl. Exs. T, V, W.  RMR created and used the RMR blotters to track the securities trading by RMR's independent contractors, including Defendants.  Riccardi Tr. 45:15-18; Smith Decl. Exs. O, P, Q. RMR's blotters detailed the relevant trade information, including trade dates, the quantity bought, the quantity sold, and which Defendant generated the recorded trade. Riccardi Tr. at 41:21-42:7; 43:11-13; 43:22-24; 44:18-45:19.  As reflected in the blotters, Jocelyn Murphy engaged in 6,407 securities transactions for RMR between November 28, 2011 and June 29, 2017, Michael Murphy engaged in 10,179 securities transactions for RMR between November 28, 2011 and March 10, 2017, and Richard Gounaud engaged in 2,250 securities transactions for RMR between August 14, 2013 and May 4, 2017.  *See* Cunningham Decl. ¶¶ 9, 13, 17.  Accordingly, the undisputed evidence shows Defendants' "regularity of participation" in securities transactions for RMR.

*Second*, Courts applying the *Hansen* factors have emphasized that "[t]ransaction-based compensation, or commissions, are one of the hallmarks of being a broker-dealer." *Collyard*, 154 F. Supp. 3d at 789; *accord Cornhusker Energy*, 2006 WL 2620985 at *6. As explained above, RMR's blotters tracked all aspects of Defendants' securities transactions for RMR, including trade date, quantities bought and sold, and which Defendant generated the trade. Defendants each received transaction-based compensation for their trading activities on behalf of RMR. When Defendants obtained securities for RMR to sell, Defendants would generally receive 50% of the profits from RMR's sale of the securities from RMR's prime brokerage account, although the percentage could vary from 33.33% to 60% depending on various circumstances of the trades. Riccardi Tr. at 76:19-77:8; 109:14-111:10; *see, e.g.,* Smith Decl. Exs. T, V, W. All profits or losses from Defendants' trading activity were realized in RMR's prime broker account before RMR paid out Defendants' commissions by wire transfer to their bank accounts or checks sent to their mailboxes. Riccardi Tr. at 32:8-33:10; J. Murphy Tr. at 153:4-15; 172:3-10; M. Murphy Tr. at 144:8-3. Further, Defendants did not earn any salary or other fixed compensation from RMR. Riccardi Tr. 78:1-17. If a Defendant did not execute any profitable trades during a particular month, that Defendant would not receive any compensation for the month. J. Murphy Tr. at 186:15-25; M. Murphy Tr. at 139:9-25; Gounaud Tr. at 190:8-23.

The undisputed evidence shows that Defendants regularly engaged in the business of effecting securities transactions for RMR's account with RMR's money, and received transaction-based compensation from RMR for providing this service. Because each Defendant engaged in this broker activity without registering with the SEC as brokers, the Court should find that Defendants violated Section 15(a)(1) of the Exchange Act.

**C.      Jocelyn Murphy Fraudulently Obtained New Issue Bonds in Violation of Section 10(b) and Rule 10b-5.**

**1.      Legal Standard.**

Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, prohibits fraud in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher*, *Inc.*, 254 F.3d 852, 855 (9th Cir. 2001).  To prove a violation of Section 10(b) and Rule 10b-5, the SEC must show 1) a material misstatement or deceptive conduct; 2) in connection with the purchase or sale of a security; 3) using interstate commerce;[14] and 4) with scienter.  *See SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007) (internal quotations and citations omitted); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010); *see also SEC v. Rana Research*, *Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).  Liability under Section 10(b) and Rule 10b-5 encompasses fraud on investors as well as fraud on underwriters and

---

[14] It is undisputed that Jocelyn Murphy's conduct involved the means of interstate commerce.  Answer of Jocelyn and Michael Murphy, ¶ 11 (Dkt. No. 39).

issuers of securities, including new issue municipal bonds. *See, e.g., SEC v. Scott, Gorman Municipals, Inc.*, 407 F. Supp. 1383, 1387 (S.D.N.Y. 1975); *SEC v. Charles A Morris & Assoc., Inc.*, 386 F. Supp. 1327, 1333 (W.D. Tenn. 1973)

### 2.   Jocelyn Murphy Made Material Misrepresentations.

Liability under Section 10(b) and Rule 10b-5 require that false statements be material. A fact is material if there is a substantial likelihood that it would be considered important to a person buying or selling securities. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Platforms Wireless*, 617 F.3d at 1092. A statement or omission is material as a matter of law where it is so obviously important that reasonable minds cannot differ on the question of materiality. *See. e.g., SEC v. Alliance Leasing Corp.*, 28 Fed. Appx. 648, 652 (9th Cir. 2002); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980).

In this matter, Jocelyn Murphy sought allotments of new issue municipal bonds offered by issuers located in Oregon and California, and other parts of the country during retail order periods by misrepresenting herself as an in-state retail investor so that her order would receive the highest priority. *See, e.g.*, Smith Decl. Exs. X, Y, Z, CC, DD. Ms. Murphy, who lived in Colorado, falsely provided Oregon, Puerto Rico, and California zip codes when she sought to obtain bonds from those jurisdictions. Moreover, she submitted more than one false zip code via different brokers for the bonds being offered by issuers in Oregon and California. *See, e.g.,* Smith Decl. X, Z, CC, DD. Providing false zip codes allowed Ms. Murphy to jump to the head of the

line and obtain new issue municipal bonds as if she qualified for the highest, in-state retail priority, when she did not.  Singer Rept. at 14.  Notably, Ms. Murphy conceded the materiality of her submission of false zip codes.  She did this when she admitted in her deposition that but for her submission of false zip codes, her order would not have received the highest priority for bonds issued in Oregon and California and would have been less likely to be filled.  J. Murphy Tr. at 99:23-100:5; 128:3-17, 159:18-160:3 163:18-164:3.

Accordingly, Ms. Murphy made material misrepresentations when she submitted false zip codes with her retail priority orders for bonds offered by issuers located in Oregon and California.

### 3.   Jocelyn Murphy Acted with Scienter.

Section 10(b) and Rule 10b-5 require a showing of scienter, which courts define as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Ninth Circuit, the SEC may establish scienter by a showing of either actual knowledge or recklessness. *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010).

Jocelyn Murphy lived in Colorado when she submitted orders during the retail order periods for new issue municipal bonds from issuers located in Oregon, Puerto Rico, and California, and she provided zip codes from those states and territory so that she could obtain bonds on the highest retail priority basis.  *See, e.g.*, Smith Decl. Exs. U, V, W, Z, AA. Ms. Murphy admitted she knew that she did not live in the zip

codes she provided to her brokers to be submitted with her orders to the issuers in those jurisdictions.  J. Murphy Tr. at 97:13-98:11; 125:5-13; 130:21-131:4 158:9-23. Ms. Murphy also admitted that she knew failing to provide a zip code from Oregon, Puerto Rico, or California would eliminate the opportunity to obtain bonds during the first order period, the retail order period.  *Id*. at 98:12-19, 99:23-100:5; 128:5-129:5, 155:9-156:5; 158:24-160:3; 162:17-164:3.

Ms. Murphy acted with scienter when she submitted materially false zip codes with her orders for bonds offered by issuers located in Oregon, California, and elsewhere.  As such, the undisputed evidence establishes that Jocelyn Murphy violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and the Court should grant summary judgment on this claim.  *See, e.g., Feng*, 935 F.3d at 734-37 (granting summary judgment on Section 10(b) where the undisputed record demonstrated scienter).

## IV.  **CONCLUSION**

For the foregoing reasons, the Court should find that Defendants Richard Gounaud, Jocelyn Murphy, and Michael Sean Murphy acted as unregistered brokers when they engaged in the business of effecting securities transactions for the account of RMR, in violation of Section 15(a)(1) of the Exchange Act.  The Court also should find that Jocelyn Murphy committed fraud when she provided false zip codes to obtain new issue municipal bonds, in violation of Section 10(b) of the Exchange Act

and Rule 10b-5 thereunder.  Upon granting this motion, the SEC requests the Court

issue a scheduling order regarding a briefing schedule and hearing on remedies.

  Dated:  April 24, 2020                    Respectfully submitted,


                                           */s/ James E. Smith*
                                           ────────────────────────
                                           JAMES E. SMITH
                                           Christian Schultz
                                           Laura J. Cunningham
                                           Warren Greth
                                           Cori M. Shepherd
                                           Kevin Guerrero
                                           Attorneys for Plaintiff
                                           Securities and Exchange Commission

# CERTIFICATE OF SERVICE

I hereby certify that, on April 24, 2020, I served The Parties Joint Stipulation for Extension of Discovery Dates on the individuals identified on the service list provided below by the following means:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I or someone on my behalf deposited in a facility regularly maintained by UPS or delivered to a UPS courier.

☒ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: April 24, 2020                              */s/ James E. Smith*

                                                  James E. Smith

1
2

**SEC v. RMR ASSET MANAGEMENT COMPANY, et al.**
**United States District Court—Southern District of California**
**Case No. 3:18-cv-01895-AJB-LL**

3
4

**SERVICE LIST**

5
6
7
8

Robert Knuts, Esq. **(served by email only)**
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
Email:  rknuts@shertremonte.com
***Counsel for Defendants Jocelyn M. Murphy and Michael S. Murphy***

9
10
11
12

Thomas D. Mauriello, Esq. **(served by email only)**
Mauriello Law Firm, APC
1230 Columbia Street, Suite 1140
San Diego, CA 92101
Email:  tomm@maurlaw.com
***Counsel for Defendants Jocelyn M. Murphy and Michael S. Murphy***

13
14
15

Richard Gounaud **(served by email only)**
9 Cliffwood Road
Chester, NJ 07930
***Defendant in Pro S***

16
17
18
19
20
21
22
23
24
25
26
27
28

24