ROBERT KNUTS
rknuts@shertremonte.com

Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2638

Attorneys for Defendants
Michael S. Murphy and Jocelyn Murphy

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>vs. )<br><br>RMR ASSET MANAGEMENT COMPANY, et al., )<br><br>Defendants. ) | Case Number: 3:18-cv-01895-AJB-LL<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY OF DEFENDNANTS MICHAEL SEAN MURPHY AND JOCELYN MURPHY<br><br>Date:  July 16, 2020<br>Time: 2:00 pm<br>Ctrm: 4A<br>Judge: Hon. Anthony J. Battaglia |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS .................................................................. 4

     A.    Background ....................................................................... 4

          1.    Defendants Sean Murphy and Jocelyn Murphy ........................ 4

          2.    Prime Brokerage Accounts ........................................ 5

          3.    New Issue Municipal Securities ................................ 7

     B.    The Murphy-Riccardi Business Partnerships ......................... 9

     C.    Jocelyn Murphy's Communications Concerning Zip Codes ............. 12

III.    ARGUMENT ........................................................................ 14

     A.    Standard of Review ........................................................ 14

     B.    Sean Murphy and Jocelyn Murphy Did Not Violate Section 15(a) of the Exchange Act ..................................... 16

     C.    Based on the Evidence Presented by the SEC Jocelyn Murphy Did Not Violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder .......................................... 22

IV.    CONCLUSION ........................................................................ 25

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242, 106 S. Ct. 2505 (1986) ........................................... 14

*Basic, Inc. v. Levinson,*
        485 U.S. 224, 108 S. Ct. 978 (1988) ............................................. 23

*Chiarella v. United States,*
        445 U.S. 222, 100 S. Ct. 1108 (1980) ........................................... 23

*Cornhusker Energy Lexington, LLC v. Prospect Street Ventures,*
        2006 WL 2620985 (D. Neb. Sept. 12, 2006) ................................. 21

*Electra Cruises Inc. v. Camping World RV Sales,*
        No. 11-Civ-1798 AJB (DHB), 2013 WL 57753333
        (S.D. Cal. Oct. 25, 2013) ............................................................... 14

*Hinkle Northwest, Inc. v. S.E.C.,*
        641 F.2d 1304 (9th Cir. 1981) ....................................................... 15

*hiQ Labs, Inc. v. LinkedIn Corporation,*
        938 F.3d 985 (9th Cir. 2019) ......................................................... 15

*In re Apple Computer Securities Litigation,*
        886 F.2d 1109 (9th Cir. 1989) ....................................................... 25

*Kokesh v. S.E.C.,*
        137 S. Ct. 1635 (2017) ................................................................... 16

*Leslie Salt Co. v. United States,*
        55 F.3d 1388 (9th Cir. 1995) ......................................................... 15

*LVRC Holdings, LLC v. Brekka,*
        581 F.3d 1127 (9th Cir. 2009) ....................................................... 15

*Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.,*
        411 F. Supp. 411 (D. Mass.), *aff'd,* 545 F.2d 754 (1st Cir. 1976), *cert.
        denied,* 431 U.S. 904 (1977) ........................................................... 17

ii

*S.E.C. v. Collyard*,
    154 F. Supp.3d 781 (D. Minn. 2015) ............................................... 21

*S.E.C. v. Kramer*,
    778 F.Supp.2d 1320 (M.D. Fla. 2011) ........................................... 21

*S.E.C. v. M&A West, Inc.*,
    No. C-01-3376 VRW, 2005 WL 1514101 (N.D. Cal. 2005) ...................... 16

*SEC v. Bravata*,
    2009 WL 2244649 (E.D. Mich. 2009) ............................................ 20

*SEC v. Feng*,
    935 F.3d 721 (9th Cir. 2019) ..................................................... 17

*SEC v. Hansen*,
    1984 WL 2413 (SDNY April 6, 1984) ............................... 17, 18, 19

*SEC v. Holcom*,
    2015 WL 11233426 (S.D. Cal. Jan. 8, 2015 ................................... 20

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) .................................................... 22

*SEC v. Small Bus. Capital Corp.*,
    2013 WL 4455850 (N.D. Cal. 2013) ............................................. 14

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438, 96 S.Ct. 2126 (1976) ............................................ 24

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ................................................................. 15

*Whitman v. United States*,
    574 U.S. 457 (2014) ................................................................. 15

**Statutes**

15 U.S.C. § 78ff(a) ................................................................................. 15

15 U.S.C. § 78u(d)(3) ............................................................................ 16

15 U.S.C. 78c(a)(4)(A) .......................................................................... 16

Section 3(a)(4)(A) of the Exchange Act ................................................. 16

Section 10(b) of the Securities Exchange Act of 1934 .......................... 23

Section 15(a) of the Securities Exchange Act of 1934 ............... 1, 2, 15, 25

Sections 1030(a)(2) and (4) of the Computer Fraud and Abuse Act ...... 15

**Rules**

Fed. R. Civ. P. 56(e) .............................................................................. 14

MSRB Rules G-11 and G-17 .................................................................. 23

## I.   __INTRODUCTION__

The motion of plaintiff Securities and Exchange Commission ("SEC") for summary judgment as to liability demonstrates that the SEC's case is built on a house of cards that cannot survive the slightest touch of scrutiny. The SEC bears the burden of proof concerning each element of its claims and it is now clear that the SEC does not even have enough evidence to present its claim that defendants violated Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") to a jury, let alone be granted summary judgment in its favor.

The SEC's claim that defendants Michael Sean Murphy ("Sean Murphy") and Jocelyn M. Murphy ("Jocelyn Murphy") were required to register with the SEC as broker-dealers in order to trade securities for their own accounts is not based on either the undisputed facts of this case or any reasonable interpretation of law. In the 86-year history of the Exchange Act, the SEC has never before claimed that someone who bought and sold publicly-traded securities in accounts maintained by that person at SEC-registered broker-dealers also needed to register as a broker-dealer based on that trading activity. The SEC has never before claimed that if an individual obtains funding from another person or entity for securities trading activity in an account maintained at an SEC-registered broker-dealer, then the securities trader needs to register as a broker-dealer with the SEC.

The SEC has never before made these claims because these claims make no sense. The purpose of the Section 15(a) registration requirement imposed by the

1

Exchange Act is to protect the public against unscrupulous individuals who might seek to sell to the public questionable securities or engage in public trading of securities on behalf of their customers or themselves in ways that harm the public markets or the financial interests of the public customers. To implement that protection, the SEC has promulgated a long list of rules for broker-dealers that include record-keeping requirements, periodic financial disclosures, and anti-insider trading compliance procedures. These companies, including such icons of American business as Merrill Lynch and Morgan Stanley, invest millions of dollars in regulatory compliance programs designed to meet the SEC's rules.

None of those rules remotely apply to the personal securities trading activities of Sean Murphy and Jocelyn Murphy, all of which were conducted on public markets, *through accounts maintained at SEC-registered broker-dealers*. As described further below, the undisputed facts demonstrate that both Sean Murphy and Jocelyn Murphy entered into business partnerships with Mr. Ralph Riccardi pursuant to which Mr. Riccardi provided: (a) funding for securities trading conducted by Sean Murphy and Jocelyn Murphy; and (b) administrative services, including the calculation of trading profits. The trading profits were split between Sean or Jocelyn Murphy and Mr. Riccardi. There is simply nothing about that simple business arrangement that required either Sean Murphy or Jocelyn Murphy to register as broker-dealers with the SEC.

With respect to the SEC's fraud claim against Jocelyn Murphy, the SEC's motion for summary judgment fails because there exist material disputed facts. Contrary to the SEC's motion, not every misstatement of fact automatically satisfies the SEC's burden to prove that the misstatement was: (i) a *material* misstatement; and (ii) was made with the requisite *scienter*. As described below, the erroneous zip code information was communicated by Jocelyn Murphy only to brokerage firms that had *actual* knowledge that the zip code was <u>not</u> the correct zip code for her home address. On the record before the Court, it is unclear whether the brokerage firms in question submitted either the correct or the incorrect zip code when the brokerage firm placed an actual order for those new issue municipal securities on behalf of Jocelyn Murphy. Nor is there is any proof that the use of an incorrect zip code was a *material* misrepresentation in the bond transactions presented by the SEC in support of its motion. Finally, the evidence presented by the SEC does not allow this Court to conclude, as a matter of law, that Jocelyn Murphy acted with scienter when communicating an incorrect zip code to a brokerage firm that simultaneously had actual knowledge of her correct zip code.

As described in more detail below, the SEC's motion for summary judgment as to liability should be denied in its entirety and, at a minimum, the SEC's Section 15(a) claim under the Exchange Act should be dismissed, thereby ending what has become a multi-year nightmare for these three individual securities traders.

## II.   STATEMENT OF FACTS

### A.   Background

#### 1.   Defendants Sean Murphy and Jocelyn Murphy

Sean and Jocelyn Murphy first met in 1992 while they both worked at Dean Witter in Denver, Colorado. Mr. and Mrs. Murphy began working in the financial services industry immediately after college.[1]

While working at Dean Witter, Mr. Murphy provided financial advice and trading recommendations to Dean Witter customers. In connection with that work, he learned about a trading strategy pursued by some of clients – purchasing new issue equity securities directly from the underwriters of a securities offering and then selling those securities in the public market on the same day as the public offering. During his time at Merrill Lynch and Dean Witter, Sean Murphy was never the subject of any written complaint from a customer or any regulatory investigation or inquiry.[2]

Sean Murphy left Dean Witter in 1995 to pursue full-time securities trading for his personal account. Over time, Sean Murphy developed expertise in purchasing and selling new issue equity securities.[3]

---

[1]    Declaration of Michael Sean Murphy in Opposition to the Plaintiff's Motion for Summary Judgment ("SM Dec."), ¶¶ 1-2; Declaration of Jocelyn M. Murphy in Opposition to the Plaintiff's Motion for Summary Judgment ("JM Dec."), ¶¶ 1-2.
[2]    SM Dec., ¶¶ 2-3.
[3]    SM Dec., ¶ 4.

4

Jocelyn Murphy left Dean Witter to join Charles Schwab and continued working in the securities industry until 2000. While at Charles Schwab, Mrs. Murphy served as a trader for Charles Schwab customers, executing unsolicited orders placed by those customers. Some of those Charles Schwab customers also followed the new issue equity securities trading strategy that had been followed by Mr. Murphy's customers at Dean Witter and which Mr. Murphy was also using for part of his personal securities trading in the late 1990s. During her time at Dean Witter and Charles Schwab, Jocelyn Murphy was never the subject of any written complaint from a customer or any regulatory investigation or inquiry. In 2000, Mrs. Murphy left her job at Dean Witter and spent most of the next decade working as a full-time, stay-at-home mother, raising two children.[4]

### 2.    Prime Brokerage Accounts

In January 1994, the SEC's Division of Market Regulation issued a no-action letter that provided SEC-registered broker-dealers with detailed guidance concerning "prime broker" arrangements. https://www.sec.gov/divisions/marketreg/mr-noaction/pbroker012594-out.pdf (the "Prime Broker No-Action Letter"). As described in that letter:

> Prime brokerage is a system developed by full-service firms to facilitate the clearance and settlement of securities trades for *substantial retail and institutional investors who are active market participants*. Prime brokerage involves three distinct parties: the prime broker, the executing broker, and

---

[4]    JM Dec., ¶¶ 3-4.

the customer. The prime broker is a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ("executing broker") at the behest of the customer. Each of the executing brokers receives a letter from the prime broker agreeing to clear and carry each trade placed by the customer with the executing broker where the customer directs delivery of money or securities to be made to or by the prime broker.

Prime Broker No-Action Letter, p. 2 (emphasis added). The SEC's Division of Market Regulation addressed how this arrangement would comply with restrictions regarding how broker-dealers could provide customers with credit to purchase securities. The SEC confirmed that a "client relationship" existed between the executing broker and the customer who opened the account at the executing broker. Prime Broker No-Action Letter, p. 9. As a result, without affirmative regulatory permission from the SEC, sufficient funds would need to exist at the executing broker for all securities purchases, thereby eliminating one of the main benefits of a prime brokerage arrangement. The SEC granted that permission but required that at least $500,000 in cash and securities be maintained in the prime broker account that would receive all the trades placed in the executing broker accounts. Prime Broker No-Action Letter, p. 10.

The prime brokerage system approved by the SEC in 1994 has become a primary system through which "substantial retail and institutional investors who are active market participants" purchase and sell securities in the U.S. financial markets. The financial advantage that the prime broker system offers to these professional traders is enormous – instead of paying for each securities purchase

with a combination of cash funds deposited in the accounts and margin loans, a trader can use the prime broker's creditworthiness to execute trades at multiple executing broker accounts.

As soon as he was able to qualify for a prime brokerage account, Sean Murphy opened such an account for his personal securities trading business. Thereafter, whenever Sean Murphy opened an account at a brokerage firm that served as an underwriter for issuances of new equity securities, Mr. Murphy linked that account to his prime broker account. Mr. Murphy continued to maintain that prime brokerage account through approximately 2008, up until the time he entered into a business partnership with Mr. Riccardi.

3.    New Issue Municipal Securities

States and cities, as well as various state and city government agencies, regularly raise money for their operations and special projects by issuing bonds. In 1975, Congress passed legislation that led to the creation of the Municipal Securities Rulemaking Board ("MSRB"). Since that time, the MSRB has functioned as the primary self-regulatory organization for the section of the financial services industry involved in the issuance and trading of municipal securities. *See Self-Regulation and the Municipal Securities Market* (January 2018) http://www.msrb.org/~/media/Files/Resources/MSRB-Self-Regulation-and-the-Municipal-Securities-Market.ashx?la=en.

As one part of its mission, the MSRB has published authoritative explanations for the processes by which municipal securities are issued and then traded in the public financial markets. The MSRB has also provided guidance to market participants concerning specific aspects of the municipal securities markets, including the considerations that should be reviewed by government agencies when deciding whether or not to identify categories of prospective purchasers and require underwriters to give certain types of purchasers priority in the new issuance of a bond. *See Issuer Considerations for Distributing Bonds: Establishing Priority of Orders* (2016), http://www.msrb.org/~/media/pdfs/msrb1/pdfs/establishing-priority-of-orders.ashx? (the "MSRB Priority Guidance").

As described in the MSRB Priority Guidance, the relevant MSRB rules require the SEC-registered broker-dealers that serve as underwriters for the new issue municipal securities to be the sole source of orders placed with the issuer for such securities. The MSRB requires those SEC-registered broker-dealers to honor any priorities required by the issuers, such as allowing retail investors to be first in line to purchase a new issue from state or city. However, the MSRB acknowledges that issuers may allow the underwriters to allocate the new issue municipal bonds in a different manner "on a case-by-case basis." MSRB Priority Guidance, p. 2.

As part of the municipal bond offering process, the SEC-registered broker-dealers that are serving as underwriters will market the offering and ask potential purchasers to indicate to the broker-dealers whether they would buy the bonds that

are being offered. After Jocelyn Murphy started her business partnership with Mr. Riccardi, she regularly received these solicitations from broker-dealers where she held accounts. If Mrs. Murphy believed it made sense to attempt to obtain an allocation of bonds, she would communicate that desire to the firm's sales representative. At no point in the marketing and allocation process did the broker-dealer that held Mrs. Murphy's brokerage accounts provide Mrs. Murphy with copies of any orders submitted by the broker-dealer to the issuer of the bonds.

     B.    <u>The Murphy-Riccardi Business Partnerships</u>

At the time that Sean Murphy left his employment at Dean Witter and launched his new career as a full-time securities trader for his personal account, Sean Murphy entered into a business partnership with a Colorado resident who was willing to provide trading capital to Mr. Murphy in exchange for a share of the trading profits (the "Colorado Partner"). The funds provided by the Colorado Partner helped meet the minimum capital requirements for the prime brokerage account established by Mr. Murphy. The accounts at those executing brokers were controlled solely by Mr. Murphy. The net trading profits achieved by Mr. Murphy in those accounts were split with the Colorado Partner.[5]

In approximately 2008, a brokerage representative introduced Mr. Murphy to Mr. Riccardi. As a result of the discussions that occurred between Messrs.

---

[5]    SM Dec., ¶¶ 6-8.

9

Murphy and Riccardi, Mr. Murphy decided to enter into a new business partnership with Mr. Riccardi that generally followed the business relationship with the Colorado Partner with one important exception – Mr. Riccardi's role in the new business partnership included administrative functions such as compiling monthly trading reports. As part of the new partnership with Mr. Riccardi, Mr. Murphy closed his prime brokerage account and linked his executing brokerage accounts to a prime brokerage account maintained by Mr. Riccardi. Linking these executing brokerage accounts with Mr. Riccardi's the prime brokerage account was the most efficient way for Mr. Riccardi to provide trading capital for the new business partnership between Messrs. Murphy and Riccardi.[6]

For the duration of this business partnership, Mr. Murphy remained responsible for all purchases and sales of securities in the executing brokerage accounts that had been established by Mr. Murphy. After the end of a month, Mr. Riccardi prepared a calculation of the trading profits and losses arising from Mr. Murphy's trading activities. Under their agreement, Mr. Murphy generally received 60% of the profits for his work and Mr. Riccardi generally received 40% of the profits for his work. Messrs. Murphy and Riccardi also shared any trading losses that occurred as a result of Mr. Murphy's trading activities. Both Mr.

---

[6]     SM Dec., ¶¶ 9-11.

Murphy and Mr. Riccardi identified themselves as business partners during the course of their working relationship.[7]

In 2010, at the suggestion of Sean Murphy and after discussions with Mr. Riccardi, Jocelyn Murphy entered into a similar trading business partnership and working relationship with Mr. Riccardi, whereby Jocelyn Murphy engaged in securities trading through accounts that she controlled and Mr. Riccardi provided both funding for that trading activity through a prime brokerage account and administrative services, such as the monthly trading reports.[8]

The focus of Jocelyn Murphy's partnership with Mr. Riccardi was to purchase and sell new issue municipal securities. To pursue that business, Jocelyn Murphy set up accounts at SEC-registered broker-dealers in the names of Humboldt Capital and Westwood Capital, two limited liability companies that she owned and controlled. Jocelyn Murphy was responsible for all purchases and sales of securities in those accounts. While she regularly received recommendations from Mr. Riccardi concerning potential purchase of new issue municipal securities, Jocelyn Murphy had ultimate responsibility and authority for determining whether to seek out such bonds.[9]

---

[7]   SM Dec., ¶¶ 10-12, 14-16, 19.
[8]   SM Dec., ¶ 13; JM Dec. ¶ 7.
[9]   JM Dec. ¶¶ 8-10.

11

Like the business partnership between Sean Murphy and Mr. Riccardi, the trading profits that arose from Jocelyn Murphy's trading in the accounts of Humboldt Capital and Westwood Capital were split between Jocelyn Murphy and Mr. Riccardi. To the extent that Mrs. Murphy's trading activities generated losses, those losses were also shared by Mrs. Murphy and Mr. Riccardi in the same percentages as trading profits.[10] Both Mrs. Murphy and Mr. Riccardi identified themselves as business partners during the period of their working relationship.[11]

C.   Jocelyn Murphy's Communications Concerning Zip Codes

In its motion papers, the SEC has identified four communications from Jocelyn Murphy to SEC-registered broker-dealer representatives in connection with potential allocations of new issue municipal securities in which Mrs. Murphy provided a zip code that was different than her home address zip code. SEC Exhibits X, Y, BB and CC. The following chart shows how the issuers of those specific bonds had prioritized the offering and allocation of those securities:

| Exhibit B | Exhibit AA | Exhibit BB | Exhibits N and FF |
|---|---|---|---|
| Issuer: Oregon | Issuer: California | Issuer: Puerto Rico | Issuer: Puerto Rico |
| Priority of Orders: | Priority of Orders: | Priority of Orders: | Priority of Orders: |
| 1. Oregon Individual Retail 2. Oregon Professional Retail | 1. California Retail 2. National Retail | 1. Retail | 1. Net Designated 2. Retail 3. Member |

---

[10]   JM Dec. ¶¶ 13-14.
[11]   JM Dec. ¶ 16.

| | | | |
|---|---|---|---|
| 3. National Individual Retail<br>4. National Professional Retail<br>5. Net Designated<br>6. Member | | | |

At the time of the communications that contained erroneous zip codes, each of the broker-dealers had actual knowledge of Mrs. Murphy's home zip code based on the account documents that she had submitted to those same brokerage firms. The SEC's motion papers do not include copies of any orders actually submitted by the broker-dealers to the issuers. Nor has the SEC provided evidence that a causal connection existed between the erroneous zip code and the allocation of the bonds received by Mrs. Murphy. Instead, the SEC has submitted evidence that Mrs. Murphy received an allocation of bonds (Exhibits EE and FF) and simply assumed that the allocation was based upon the erroneous zip code information.

In short, while there is no dispute that a potential purchaser with a higher priority *could* benefit from that higher priority, the SEC has presented no evidence that the specific erroneous zip code information in these four instances had any impact on either Mrs. Murphy's allocation *or on anyone else who wished to purchase these bonds*. In other words, the SEC asks this Court to find that Mrs. Murphy engaged in securities fraud without any proof that the erroneous zip codes actually made any difference to anyone.

## III.   __ARGUMENT__

A.   <u>Standard of Review</u>

Summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Electra Cruises Inc. v. Camping World RV Sales*, No. 11-Civ-1798 AJB (DHB), 2013 WL 57753333, at * 2 (S.D. Cal. Oct. 25, 2013) (citing Fed. R. Civ. P. 56(e) (West 2006)).  "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*.

 "In considering the motion, the court must examine all the evidence in the light most favorable to the non-moving party and all justifiable inferences are to be drawn in his favor." *Electra Cruises Inc.*, 2013 WL 57753333, at * 2 (citing *Anderson*, 477 U.S. at 248).  *See SEC v. Small Bus. Capital Corp.*, 2013 WL 4455850, at *2 (N.D. Cal. 2013) ("The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.")

In addition, this Court should also analyze the SEC's claim that Defendants violated Section 15(a) of the Exchange Act by failing to register with the SEC as broker-dealers under the rule of lenity.

> The rule of lenity requires interpreters to resolve ambiguity in criminal laws in favor of defendants…. If a law has both criminal and civil applications, the rule of lenity governs its interpretation in both settings.

14

*Whitman v. United States*, 574 U.S. 457 (2014) (Scalia and Thomas, Js., concurring in denial of certiorari); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 518, n. 10 (1992) (plurality opinion)); *hiQ Labs, Inc. v. LinkedIn Corporation*, 938 F.3d 985, 1003 (9th Cir. 2019) (applying lenity to arrive at a narrow interpretation of a statutory provision where the statute can be applied in a "criminal or noncriminal context"); *LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1134-35 (9th Cir. 2009) ("Although this case arises in a civil context, our interpretation of §§ 1030(a)(2) and (4) [of the Computer Fraud and Abuse Act] is equally applicable in the criminal context."); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1398 (9th Cir. 1995) (lenity applies to preclude civil penalties for violation of the Clean Waters Act) ("The rule of lenity has not been limited to criminal statutes, particularly when the civil sanctions in question are punitive in character.") As described by the Ninth Circuit in *LVRC Holdings*, *supra*, the rule of lenity

> vindicates the fundamental principle that no citizen should be held
> accountable for a violation of a statute whose commands are uncertain, or
> subjected to punishment that is not clearly prescribed.

581 F.3d at 1135.

Here, the rule of lenity applies to the SEC's claim under Section 15(a) of the Exchange Act because a violation of that section may also lead to criminal charges. *See* 15 U.S.C. § 78ff(a) (providing criminal penalties); *Hinkle Northwest, Inc. v. S.E.C.*, 641 F.2d 1304, 1309 (9th Cir. 1981). In addition, a Section 15(a) violation may also result in sanctions that are punitive in nature. *See Kokesh v. S.E.C.*, 137

15

S. Ct. 1635 (2017) (disgorgement remedy sought by SEC may be a punitive sanction); 15 U.S.C. § 78u(d)(3) (monetary penalties).

This Court should also apply lenity to the SEC's alleged Section 15(a) violation because of the ambiguity surrounding the definition of "brokers" under Section 3(a)(4)(A) of the Exchange Act. In *S.E.C. v. M&A West, Inc.*, the court granted summary judgment, *sua sponte*, in favor of the defendant after finding Section 3(a)(4)(A)'s definition of a "broker" to be "somewhat opaque." No. C-01-3376 VRW, 2005 WL 1514101, at *1 (N.D. Cal. 2005). There, the court noted that the facts relied upon by the SEC in favor of requiring to register as a broker barely differentiated the defendant from "businessmen (who identify potential merger partners) and opportunists (who like to take a small cut of a big transaction), none of whom is commonly regarded as a broker . . . ." *Id*. Application of this rule is also appropriate because "Section 15(a) is a strict liability statute; neither scienter nor negligence is required to prove its violation." Pl. Br., p. 12.

B.    Sean Murphy and Jocelyn Murphy Did Not
      <u>Violate Section 15(a) of the Exchange Act</u>

Section 15(a) of the Exchange Act prohibits any "broker" from effecting transactions in, or inducing or attempting to induce any purchase or sale of, any security without first registering with the SEC. Section 3(a)(4)A of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. 78c(a)(4)(A). The

16

SEC has not enacted any administrative rules that define the phrase "effecting transactions in securities for the account of others."

In the absence of any SEC rules further defining "broker", Federal courts have identified a variety of factors that might (or might not) lead to the conclusion that a person had "engaged in the business of effecting transactions for the account of others." In *SEC v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019), the Court approved a "totality-of-the-circumstances approach" that relied on factors first described in *SEC v. Hansen*, 1984 WL 2413 at *10 (SDNY April 6, 1984). The *Hansen* court identified the following six factors as relevant to determining whether a person met the definition of "broker": (1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3) is selling, or previously sold, the securities of other issuers; (4) is involved in negotiations between the issuer and the investor; (5) makes valuations as to the merits of the investment or gives advice; and (6) is an active rather than passive finder of investors. *Id.* The *Hansen* court also noted that other courts had required the SEC to show that the individual defendant had regularly participated "in securities transactions at *key points in the chain of distribution*." *Id.* (*quoting Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977)) (emphasis added).

According to the SEC's brief, "no one factor is dispositive and a Court can find a person acted as a broker even where only one or two of the *Hansen* factors

17

are met." Pl. Br., p. 14. The SEC further argues that the following two *Hansen* factors are "most important" in determining whether a defendant's activities met the definition of "effecting transactions in securities for the account of others": "regularity of participation in securities transactions and receipt of transaction-based compensation." *Id.*

The *Hansen* factors and the SEC's argument that this Court should rely on just two of those factors dramatically demonstrates why this Court should apply the rule of lenity to the Section 15(a) claim. There was simply no way for Sean and Jocelyn Murphy to know in advance how the SEC or this Court would apply and weigh these so-called factors when deciding whether or not Mr. and Mrs. Murphy needed to register as a broker-dealer when they entered into business partnerships with Mr. Riccardi.

Moreover, any reasonably objective assessment of the *Hansen* factors demonstrates that neither Sean Murphy nor Jocelyn Murphy "effected transactions in securities for the account of others". The following chart shows how these factors apply to Mr. and Mrs. Murphy's trading of securities:

| Hansen factor | For/Against Broker Finding | Explanation |
|---|---|---|
| 1) is an employee of the issuer; | Against | Mr. and Mrs. Murphy were not employed by any issuer of municipal securities to sell those securities to the investing public. Instead, they were part of that investing public! |

| 2) received commissions as opposed to a salary; | Against | Mr. and Mrs. Murphy never received any commissions from either the underwriters or selling agents who sold them any securities or from the brokerage firms who purchased those securities from them on the public markets. Instead, they received a share of the trading profits that they earned from the purchase and sales of securities. |
|---|---|---|
| 3) is selling, or previously sold, the securities of other issuers; | Against | Mr. and Mrs. Murphy never acted on behalf of any issuer to sell securities to members of the investing public. |
| 4) is involved in negotiations between the issuer and the investor; | Against | Mr. and Mrs. Murphy never participated in any negotiations concerning the terms of the offerings made by issuers. |
| 5) makes valuations as to the merits of the investment or gives advice; and | Against | Mr. and Mrs. Murphy never published valuations or gave investment advice to prospective investors concerning the issuance of securities. |
| 6) is an active rather than passive finder of investors. | Against | Mr. and Mrs. Murphy never solicited other investors on behalf of any issuer of securities to seek an allocation of that new issuance. |

In the face of these facts, the SEC attempts to obtain summary judgment by distorting two factors described in *Hansen* – regular participation in securities transactions and transaction-based compensation. Pl. Brief, pp. 15-16.

First, the SEC claims that regular participation in securities transactions is "the most important [*Hansen*] factor", *quoting SEC v. Holcom*, 2015 WL 11233426 at *4 (S.D. Cal. Jan. 8, 2015. Pl. Brief, p. 15. In turn, the *Holcom* court quoted from *SEC v. Bravata*, which identified the most important factor as "regularity of participation in securities transactions *at key points in the chain of distribution*." 2009 WL 2244649 at *2 (E.D. Mich. 2009) (emphasis added). In its brief, the SEC omits the phrase "key points in the chain of distribution." A "distribution" of securities occurs <u>before</u> there is any public trading of those securities. Brokers often play a key role in that initial distribution of securities and the brokers in this case were the underwriters who solicited Sean and Jocelyn Murphy to purchase new issue securities, <u>not</u> Mr. and Mrs. Murphy.

Moreover, Sean and Jocelyn Murphy did not engage in securities transactions "for" Mr. Riccardi. All of the orders placed by Mr. and Mrs. Murphy to buy and sell securities were given to the SEC-registered broker-dealers where Mr. and Mrs. Murphy maintained accounts in the names of LLCs owned and controlled by Mr. and Mrs. Murphy. The fact that Mr. Riccardi provided capital for those trades via a prime brokerage account cannot magically transform those transactions into trades "for" Mr. Riccardi.

The second factor emphasized by the SEC in its brief – transaction-based compensation – involves similar word games by the SEC. It is undisputed that receiving a "commission" in connection with a transaction is one hallmark of

acting as a broker-intermediary in connection with that transaction. It is undisputed that neither Sean Murphy or Jocelyn Murphy received any "commissions" from either the underwriters who sold new issue securities to them or the persons to whom Mr. and Mrs. Murphy re-sold the securities.

None of the cases cited by the SEC concerning "transaction-based compensation" involved a payment based on a percentage of net profits from a pair of securities trades. *See* Pl. Br., pp. 15 and 17; *S.E.C. v. Kramer*, 778 F.Supp.2d 1320, 1331-32 (M.D. Fla. 2011) (defendant paid between $189,000 and $200,000 in return for introducing an investor who made a $14 million investment; compensation not based on profits of transaction); *S.E.C. v. Collyard*, 154 F. Supp.3d 781, 786 (D. Minn. 2015) (defendant was paid a "3% commission on each referral's investment," and a "10% fee on any investments made by persons whom [defendant] 'found' and referred."; no compensation based on profits of transaction); *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, at * 3 (D. Neb. Sept. 12, 2006) ("The agreed-upon compensation included a consulting fee of $50,000 . . ., as well as a success fee of varying percentages of the gross proceeds of the transaction depending on the type of capital involved"; no compensation based on profits of transaction).

Moreover, the SEC's argument fails to recognize that a percentage share of net profits cannot constitute "transaction-based compensation" when the business partnership agreements entered into by Sean and Jocelyn Murphy with Mr.

21

Riccardi also required Mr. and Mrs. Murphy *to pay their share of net losses to Mr.*

*Riccardi.* Sharing profits and losses simply cannot be fairly described as a

"commission" or "transaction-based compensation."

For all these reasons, the SEC's motion for summary judgment in its favor

on its Section 15(a) claim must be denied. Given the undisputed and undisputable

facts presented to the Court, that claim should instead be dismissed.

> C. Based on the Evidence Presented by the SEC
> Jocelyn Murphy Did Not Violate Section 10(b)
> of the Exchange Act and Rule 10b-5 thereunder

The SEC's Section 10(b) and Rule 10b-5 claim against Jocelyn Murphy

requires the SEC to prove, in relevant part, that Jocelyn Murphy: (a) made a

material misstatement of fact; and (b) did so with scienter. *SEC v. Platforms*

*Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). According to the SEC,

by identifying erroneous zip codes in communications with SEC-registered broker-

dealers, Mrs. Murphy "misrepresent[ed] herself as an in-state retail investor so that

her order would receive the highest priority." Pl. Br., p. 19. In support of its

motion, the SEC argues that Jocelyn Murphy admitted in deposition testimony that

the erroneous zip code information was "material". Pl. Br., p. 20. Finally, the SEC

contends that because she knew her correct home zip code, she must have acted

with scienter when she identified the erroneous zip code in the communications

with the broker-dealer sales representative. Pl. Br., pp. 20-21.

The U.S. Supreme Court has pointedly stated that "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella v. United States*, 445 U.S. 222, 234-35, 100 S. Ct. 1108, 1118 (1980). Here, the SEC's fraud claim against Jocelyn Murphy rests solely on her communication of erroneous zip codes to SEC-registered broker-dealers who knew her correct zip code. Thus, those firms simply were not deceived.

Moreover, the SEC has not presented evidence that the SEC-registered broker-dealers who received the erroneous zip code information, in turn, communicated that information to anyone else. MSRB Rules G-11 and G-17 require underwriters to allocate the new issue bonds in accordance with the priorities set by the issuer and to make sure any orders submitted during a retail order period meet the issuer's conditions. Given those requirements and the absence of any actual orders for the relevant bonds, there is no proof before the Court that any issuer was deceived by the erroneous zip code information.

Even if the SEC could prove that the erroneous zip code information was transmitted to the issuers by the SEC-registered broker-dealers, the SEC has not submitted evidence that such information was "material" to anyone who participated in the issuance of the bonds. According to the U.S. Supreme Court, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 240, 108 S. Ct. 978, 988 (1988). To make that assessment, a fact finder must

determine whether or not there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976).

Here, the issuers of the new municipal bonds had the power both to set priorities for allocation of bonds and to waive compliance with those priorities. No evidence is presented by the SEC that the erroneous zip code information provided by Jocelyn Murphy "significantly altered the total mix of information" available to the relevant issuers. No evidence is presented by the SEC that any other investor who sought to purchase those bonds did not, in fact, receive an allocation for the relevant bonds. Without any such evidence, this Court cannot find as a matter of law that erroneous zip code information was a material misrepresentation.[12]

Finally, the SEC has not presented evidence to establish that when she communicated the information to the SEC-registered broker-dealers, Jocelyn

---

[12]    Contrary to an argument made by the SEC (Pl. Br., p. 20), Jocelyn Murphy did not "admit" that the zip code information was "material" during her deposition. Instead, her testimony reflected Mrs. Murphy's uncertainty concerning whether a wrong ZIP code would make the difference between receiving an allocation and not receiving an allocation.  *See, e.g.*, Deposition Transcript 99:23-25 ("I believed I would get a – being in the first order period, which was retail, it's going to get me the best bonds); id. 128:22-23 ("Since it [was] a chance, I do not know how much [failure to provide a local ZIP code] would decrease it or if it did decrease it."); id. 160:9-11 ("I gave Mr. O'Rourke a ZIP code in which he could do what he wanted with.").

24

Murphy did so with an intent to deceive. First, the persons to whom she communicated that information knew that it was erroneous. Second, Mrs. Murphy testified that she did not know for a fact whether the erroneous zip codes would make a difference as to whether or not she received an allocation of new issue bonds. On this record, this Court cannot find that the SEC has proven that Jocelyn Murphy acted with scienter as a matter of law. *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1113 (9th Cir. 1989) ("Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact.")

## IV.   <u>CONCLUSION</u>

For the reasons set forth above and in the accompanying sworn declarations of Sean Murphy and Jocelyn Murphy, this Court should deny the SEC's motion for summary judgment as to liability in its entirety. In addition, this Court should allow the SEC to supplement its filing with any further evidence in its possession concerning the Section 15(a) claim and if none is forthcoming, the Court should dismiss the Section 15(a) claim as a matter of law.

Dated:        May 29, 2020                  Respectfully submitted,

                                            SHER TREMONTE LLP


                                            By: /s/ Robert Knuts
                                                    Robert Knuts

                                            Attorneys for Defendants
                                            Michael Sean Murphy and
                                            Jocelyn M. Murphy

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on May 29, 2020, I caused the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY OF DEFENDNANTS MICHAEL SEAN MURPHY AND JOCELYN MURPHY to be served on the individuals identified below by both Electronic Mail and E-Filing:

James E. Smith, Esq.
Christian Schultz, Esq.
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Email: smithja@sec.gov and schultzc@sec.gov

Counsel for Plaintiff


Mr. Richard Gounaud
9 Cliffwood Road
Chester, NJ 07930
Email: rgounaud@gmail.com

Defendant, *pro se*

I declare under penalty of perjury that the foregoing is true and correct.


Date: May 29, 2020          <u>/s/ Robert Knuts</u>
                           Robert Knuts