UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>RMR ASSET MANAGEMENT COMPANY, et al.,<br><br>　　　　　　　　　　　Defendants. | Case No.: 18-CV-1895-AJB-LL<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST RICHARD GOUNAUD, MICHAEL SEAN MURPHY, AND JOCELYN MURPHY**<br><br>(Doc. Nos. 115, 133) |

Presently before the Court is Plaintiff's motion for summary judgment against Richard Gounaud, Michael Sean Murphy, and Jocelyn Murphy. (Doc. No. 115.) Defendant Richard Gounaud opposes this motion. (Doc. No. 122.) Defendants Michael Sean Murphy and Jocelyn Murphy also oppose this motion. (Doc. No. 123.) The Court held a hearing on Plaintiff's motion for summary judgment on July 23, 2020. For the reasons set forth more clearly below, the Court **GRANTS** Plaintiff's motion for summary judgment.

# BACKGROUND

Ralph Riccardi founded RMR in 1995 and its primary business was to buy and re-sell municipal bonds and other securities. (Doc. No. 115-1 at 10.) Defendants were enlisted by Riccardi to open new brokerage accounts to help RMR increase the number of orders it could place for new issue municipal bonds and other securities. (*Id.*) Riccardi directed Defendants to trade for RMR. (*Id.*)

Jocelyn Murphy engaged in 6,407 securities transactions for RMR, including 2,410 transactions involving new issue municipal bonds, between November 28, 2011 and June 29, 2017. (*Id.* at 14.) Michael Murphy engaged in 10,179 securities transactions for RMR, including 399 transactions involving new issue bonds, between November 28, 2011 and March 10, 2017. (*Id.*) Richard Gounaud engaged in 2,250 securities transactions for RMR, including 360 transactions involving new issue municipal bonds, between August 14, 2013 and May 4, 2017. (*Id.*) Each Defendant received a percentage of the profits and losses. (Doc. No. 122 at 4; Doc. No. 123 at 15, 17.)

Furthermore, Jocelyn Murphy provided brokers with a zip code to submit to the underwriters with her orders. (Doc. No. 115-1 at 15.) Ms. Murphy understood that retail orders, as listed in priority of orders, were reserved for individual investors with zip codes in the issuer's jurisdiction. (*Id.*) Ms. Murphy also understood that if she submitted her Colorado zip code with an order for bonds issued outside of Colorado where the issuer had reserved the highest priority for in-state residents, her order would not qualify for the highest retail priority. (*Id.*) Therefore, Ms. Murphy would provide zip code corresponding to the jurisdictions she was seeking an order of bonds from, despite the fact that she did not reside in these jurisdictions. (*Id.* at 16.)

# LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the

case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Celotex Corp.*, 477 U.S. at 330. When ruling on a summary judgment motion, a court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiff bases its motion for summary judgment on two main arguments. The first argument is that Defendants acted as unregistered broker-dealers in violation of Section 15(a) of the Exchange Act. The second argument is that Jocelyn Murphy fraudulently obtained new issue bonds in violation of Section 10(b) and Rule 10b-5. The Court will address each argument in turn.

A.  <u>Section 15(a) of the Exchange Act</u>

Section 15(a) of the Exchange Act makes it unlawful for a broker or dealer "to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless the broker or dealer is registered with the SEC in accordance with Section 15(b). Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the

business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A).

The Ninth Circuit applies conduct-based factors and a "totality of the circumstances approach" to determine whether a person has engaged in the business of being a broker. *See SEC v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019). The *Hansen* court identified the following six factors as relevant to determining whether a person met the definition of "broker": (1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3) is selling, previously sold, the securities of other issuers; (4) is involved in negotiations between the issuer and the investor; (5) makes valuations as to the merits of investment or gives advice; and (6) is an active rather than passive finder of investors. *See SEC v. Hansen*, No. 83 Civ. 3692 (LPG), 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984).

First, Plaintiff argues that Defendants acted as unregistered brokers because they effected securities transactions for RMR in return for transaction-based compensation. (Doc. No. 115-1 at 20.) "'The most important factor in determining whether an individual or entity is a broker' is the 'regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC v. Holcom*, No. 12-cv-1623, 2015 WL 11233426, at *4 (S.D. Cal. Jan. 8, 2012) (quoting *SEC v. Bravata*, No. 09-12950, 2009 WL 2245649, at *2 (E.D. Mich. July 27, 2009)). Defendants admit that Riccardi and RMR directed Defendants to link their brokerage accounts to RMR's prime broker account so Defendants could use RMR's capital to purchase new issue municipal bonds and other securities. (*See* Riccardi Depo. at 32:8–33:10; 160:10–11; J. Murphy Depo. at 17:11–18:15; 41:19–42:12; 112:8–113:11; M. Murphy Depo. at 50:1–17; 65:21–66:1; Gounaud Depo. at 64:17–23; 82:2–12; 100:25–101:19.) Defendants controlled their accounts; however, they conducted their trading activity on behalf of RMR through RMR's prime brokerage account. (*See id.*) Riccardi and RMR funded the prime broker account. (Riccardi Depo. at 164:2–6.)

Defendants Michael Murphy and Jocelyn Murphy argue that they did not engage in securities transactions "for" Riccardi. (Doc. No. 123 at 25.) They assert that simply because Riccardi provided the capital does not transform those transactions into trades

"for" Riccardi. (*Id.*) Defendant Gounaud argues that a portion of the capital of RMR's prime brokerage account belonged to him. (Doc. No. 122 at 4.) However, there are several exhibits that contain emails establishing that Riccardi and RMR directed Defendants to purchase securities. (Doc. Nos. 125-9; 125-10; 125-11; 125-12.) Further, Defendant Jocelyn Murphy admitted in her deposition that she had never traded municipal securities before working with RMR, and Riccardi trained her at his office on how to trade for RMR. (J. Murphy Depo. at 44–46.) Furthermore, Defendant Gounaud provides no evidence that a portion of the capital of RMR's prime brokerage account belonged to him, and he admitted that he received compensation via RMR's prime brokerage account only if trades created profits in a given time period. (Gounaud Depo. at 190:19–23.) It is undisputed that Defendants engaged in a large amount of frequent transactions. Accordingly, it is undisputed that Defendants engaged in regularity of participation in securities transactions and, based on the above, it was for RMR.

Defendants also argue that they were in a "partnership" with Riccardi. (Doc. No. 122 at 4; Doc. No. 123 at 12, 14–17.) However, Defendants provide no evidence of this other than self-serving declarations. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.")

In 2016, Defendant Gounaud provided responses to an SEC investigative questionnaire. Defendant Gounaud stated that he worked for himself and was associated with Riccardi, but did not identify any partnership with Riccardi or RMR. (Doc. No. 125-3 at 7.) Further, Defendant Gounaud admitted that RMR gave him an IRS Form 1099, which is for self-employed independent contractors. (Gounaud Depo. at 219:10–21.) During the hearing on this matter, the Court permitted Defendant Gounaud to supply the Court with the IRS Form 1099. Defendant Gounaud provided the IRS Form 1099 to the Court along with a supplemental motion. (Doc. No. 134.) Defendant Gounaud should have sought leave of the Court prior to filing a supplemental motion that is essentially a sur-

reply. *See* Judge Battaglia Civil Case Procedures II.E. However, Defendant Gounaud was given the opportunity to present these arguments at the hearing on this matter, so the Court will briefly address these arguments. The IRS Form 1099 issued to Defendant Gounaud states that the income he received is miscellaneous income. However, this does not change the Court's analysis. Defendant Gounaud was not issued an IRS Schedule K-1 or any other record to establish a partnership. Defendant Gounaud argues that RMR elected out of Subchapter K, but there is no evidence that his relationship with RMR was an investment partnership under 26 CFR § 1.761-2(a)(2). Defendant Gounaud further admits that his partnership with RMR never filed a Form 1065 electing out of a Subchapter K, and does not offer any evidence of an agreement among the members that the organization would be excluded from Subchapter K. Defendant Gounaud also argues that he did not identify his relationship with Riccardi and RMR in response to SEC investigative questionnaire because it was the focus of the investigation. However, again, Defendant Gounaud has not provided anything to rebut the evidence that his relationship with Riccardi and RMR was as an independent contractor. Lastly, Defendant Gounaud argues that an eight-factor test in *Holdner v. Com'r*, 100 T.C.M. (CCH) 108 (T.C. 2010), *aff'd*, 483 F. App'x 383 (9th Cir. 2012) (quoting *Luna v. Commissioner*, 42 T.C. 1067, 1077–78, 1964 WL 1259 (1964)) establishes the existence of a partnership. However, Defendant Gounaud presents no evidence or argument as to how these factors establish a partnership in this case.

Defendants Jocelyn and Michael Murphy also responded to the 2016 SEC questionnaire as self-employed and failed to identify any partnership with Riccardi or RMR in their responses to an SEC investigative questionnaire. (Doc. No. 125-5 at 5; Doc. No. 125-6 at 5.) Defendant Jocelyn Murphy also testified that she nor Defendant Michael Murphy received an IRS Schedule K-1 from Riccardi or RMR. (J. Murphy Depo. at 56:11–13; 79:10–80:14.) Furthermore, Riccardi testified that he never "perceived [Defendants] as anything other than independent contractors." (Riccardi Depo. at 167:6–8.) Thus, there is overwhelming evidence that Defendants' relationship with RMR was not a partnership, and there is no evidence other than self-serving declarations of Defendants to support that

1 this relationship was a partnership.

2     Second, Plaintiff argues that each of the Defendants received transaction-based compensation for their trading activities on behalf of RMR. (Doc. No. 115-1 at 22.) Defendants argue that they did not receive transaction-based compensation, but rather were paid based on a percentage of net profits. (Doc. No. 122 at 10–13; Doc. No. 123 at 26–27.) Further, Defendants admitted that if they failed to complete a profitable trade in a measuring time period, they received no payments for this activity. (Doc. No. 125 at 8; J. Murphy Depo. at 186:9–25; M. Murphy Depo. at 139:10–14; Gounaud Depo. at 190:19–23.) The Court is not persuaded by Defendants' argument that this form of compensation is different than transaction-based compensation.

    The parties briefly mention the other factors. Plaintiff asserts that Defendants' conduct satisfies several of these additional *Hansen* factors, as none of the Defendants were employed by any issuer, they all sold securities of issuers, and Defendant Jocelyn Murphy actively located investors to purchase securities sold by RMR. (Doc. No. 115-1 at 18.) Defendants do not dispute that were not employed by an issuer. (Doc. No. 122 at 9; Doc. No. 123 at 23.) However, Defendants do dispute selling securities of issuers and that Defendant Jocelyn Murphy actively located investors to purchase securities sold by RMR. (Doc. No. 122 at 10; Doc. No. 123 at 24.) There are at least two emails where Defendant Jocelyn Murphy is actively locating investors to purchase securities sold by RMR. (Doc. Nos. 115-17; 115-35.) Based on the totality of the circumstances, there is no question of material fact and as a matter of law Defendants were brokers as defined by Section 3(a)(4)(A) of the Exchange Act. There is no dispute that Defendants did not register as brokers as required by Section 15(a) of the Exchange Act.

B.   <u>Section 10(b) of the Exchange Act and Rule 10b-5</u>

    Section 10(b) of the Exchange Act and Rule 10b-5 prohibits fraud in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001). To prove a violation of Section 10(b) and Rule 10b-5, the SEC must show: (1) a material misstatement or deceptive

conduct; (2) in connection with the purchase or sale of security; (3) using interstate commerce; and (4) with scienter. *See SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010); *see also SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).

First, Plaintiff argues that Defendant Jocelyn Murphy made material misrepresentations when providing false zip codes to brokers. (Doc. No. 115-1 at 24.) The Supreme Court has held that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 240 (1988). Defendant Jocelyn Murphy falsely provided Oregon, Puerto Rico, and California zip codes when she sought to obtain bonds from those jurisdictions. She submitted more than one false zip code via different brokers for the bonds being offered by issuers in Oregon and California.

MSRB Rules G-11 and G-17 require underwriters to allocate the new issue bonds in accordance with the priorities set by the issuer, and to make sure any orders submitted during a retail order period meet the issuer's conditions. Defendant Jocelyn Murphy admitted that the first priority bonds that she sought and obtained from California and Oregon were "California Retail" and "Oregon Retail." (Doc. No. 123 at 17.) Defendant Jocelyn Murphy also admitted that without providing these false zip codes, she would not have been in the retail order period, and thus, would not have received the highest priority. (J. Murphy Depo. at 99:23–100:5; 128:3–17; 159:18–160:3; 163:18–164:3.) Furthermore, Plaintiff has provided unrebutted expert testimony that local zip codes are important to issuers of new municipal bonds. (Doc. No. 115-4 at 17.)

Defendant Jocelyn Murphy asserts that there is no evidence that any other investor who sought to purchase those bonds did not receive an allocation for the relevant bonds. (Doc. No. 123 at 29.) Defendant Jocelyn Murphy further argues that there is no evidence that the SEC-registered broker-dealers who received the false zip code information communicated that information to anyone else. (*Id.* at 28.) However, as explained above, Defendant Jocelyn Murphy herself stated that she would not have been in the retail order

period without providing these false zip codes. Accordingly, based on Defendant Jocelyn Murphy's own admissions and Plaintiff's expert testimony, providing false zip codes was a material misrepresentation in order to obtain priority in obtaining bonds.

Section 10(b) and Rule 10b-5 require a showing of scienter, which courts define as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, the SEC may establish scienter by a showing of either actual knowledge or recklessness. *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010).

Plaintiff asserts that Defendant Jocelyn Murphy acted with scienter when she submitted materially false zip codes with her orders for bonds offered by issuers located in Oregon, California, and elsewhere. (Doc. No. 115-1 at 26.) Defendant Jocelyn Murphy argues that she did not provide false zip codes with the intent to deceive because the persons whom she communicated that information knew it was erroneous, and she did not know for a fact whether the erroneous zip code would make a difference as to whether or not she received an allocation of new issue bonds. (Doc. No. 123 at 30.) She also asserts that the SEC has offered no evidence that any issuer was deceived by the false zip codes or that any investor was actually harmed. (*Id.* at 28.)

Defendant Jocelyn Murphy knew that she did not reside in these zip codes. (J. Murphy Depo. at 97:13–98:11; 125:5–13; 130:21–131:4; 158:9–23.) Defendant Jocelyn Murphy also admitted she knew failing to provide a zip code from these jurisdictions would not place her in the highest priority period, the retail order period. (J. Murphy Depo. at 99:23–100:5; 128:3–17; 159:18–160:3; 163:18–164:3.) For example, Defendant Jocelyn Murphy specifically testified in her deposition:

> Q: So if you want to be first in line based on the priority of orders and the definition of retail order for this California bond deal, you had to submit a zip code; correct?
> A: Correct.
> Q: And that would be a California zip code; correct?
> A: Yes. Correct.
> Q: If you submitted a Denver zip code, do you believe you would

```
            be considered California retail?
        A: No.
```

(J. Murphy Depo. at 155:16–156:5 (objections omitted)).

Defendant Jocelyn Murphy also provides no evidence that the brokers knew her correct zip code. However, based on her own testimony, Defendant Jocelyn Murphy knew when she provided these brokers with false zip codes her order could be considered in the local retail allocation in jurisdictions where she did not reside. Furthermore, the SEC is not required to prove reliance or actual harm to the issuers or investors. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) (SEC not required to prove reliance); *Graham v. SEC*, 222 F.3d 994, 1002 (D.C. Cir. 2000) (SEC not required to prove actual harm to investors) (citing *United States v. Naftalin*, 441 U.S. 786 (1979)); *SEC v. Zouvas*, No. 16-cv-0998-CAB-DHB, 2016 WL 6834028, at *10 (S.D. Cal. Nov. 21, 2016) (same) (citing *Naftalin*). The evidence presented clearly establishes scienter.

Accordingly, Plaintiff has established that there is no genuine issue of material fact and as a matter of law Defendant Jocelyn Murphy fraudulently obtained new issue bonds in violation of Section 10(b) and Rule 10b-5.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Plaintiff's motion for summary judgment. **Within 45 days** of the date of this Order, Plaintiff's must file a motion regarding the remedies sought in this matter and must call the Court's Chambers to obtain a hearing date upon filing of such motion.

**IT IS SO ORDERED**.

Dated: August 14, 2020

Hon. Anthony J. Battaglia
United States District Judge